UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**MICHAEL PAUL BOUDREAU**,                    Case No. 3:15-cv-00978-KI

Plaintiff,                    OPINION AND ORDER

v.

**CAROLYN COLVIN, Acting
Commissioner of Social Security**,

Defendant.

Merrill Schneider
Schneider Kerr Law Offices
P.O. Box 14490
Portland, Oregon 97293

Attorney for Plaintiff

Billy J. Williams
United States Attorney
District of Oregon
Janice E. Hebert

Page 1 - OPINION AND ORDER

Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Catherine Escobar
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant


KING, Judge:

Plaintiff Michael Paul Boudreau brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

Boudreau filed applications for DIB and SSI on January 25, 2012, alleging disability beginning December 31, 2006. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Boudreau, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on October 17, 2013.

On October 31, 2013, the ALJ issued a decision finding Boudreau not disabled within the meaning of the Act and therefore not entitled to benefits. The Appeals Council declined to review the decision of the ALJ on April 1, 2015, making the decision final.

PAGE 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ determined Boudreau met the insured status requirements through December 31,

2006, and that he had not undertaken substantial gainful activity since that date. Boudreau's

severe impairments are affective disorder and personality disorder. However, these impairments,

either singly or in combination, did not meet or medically equal the requirements of any of the

impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ thought Boudreau could

perform light work, so long as the detailed tasks are not highly complex (i.e. not more than SVP

4) and so long as he has only occasional, brief, superficial contact with the public and co-

workers. Given this residual functional capacity ("RFC"), the ALJ concluded Boudreau could

perform his past relevant work as a dump truck driver. Alternatively, he could perform other

work in the national economy, such as janitor or inventory clerk. Accordingly, the ALJ

concluded Boudreau was not disabled within the meaning of the Act.

## FACTS

Boudreau, 41 years old on his alleged disability onset date, has work history in the

construction industry, and in management at Sears and Burger King. He also has an employment

history with a few companies at which he could not recall the type of work he performed. He

testified he worked for Chrysler, but there is no evidence to support that.

Five years before his alleged onset date of disability, Boudreau was admitted to the Catawba Hospital on June 4, 2001 reporting homicidal and suicidal thoughts upon transfer from the Roanoke Memorial Hospital. The psychiatrist at Roanoke was concerned Boudreau had an antisocial personality disorder and was malingering. Boudreau was released after showing no signs of psychosis after four days. He returned the next day panicking about a lack of shelter, and was discharged two days later upon securing shelter with the Salvation Army. Three months later, Boudreau overdosed on Luvox (normally used to treat anxiety, depression and PTSD) and returned to the hospital. At intake, he reported "stereotyped hallucinations of a little man" which he did not repeat and the staff psychiatrist felt Boudreau had malingered his symptoms. Tr. 557. He also told the therapist that his ex-wife had died by suicide two weeks before. Two years later, in June 2003, Boudreau was back. He reported being on probation after release in December 2002 from an 18- month jail sentence. He did not remember telling the therapist that his ex-wife had hung herself, causing the therapist to comment, "There continue to be some variations in his history that raise issues of reliability." Tr. 553. He was diagnosed with major depressive disorder, rule-out dysthymia, rule-out PTSD, alcohol abuse, borderline personality traits, anti-social traits. In November 2005, a little more than two years later, Boudreau returned to Catawba Hospital, complaining of worsening hallucinations and depression, and concerned he would act in a dangerous way to himself or others. He revealed he had been released from prison in June 2005 after serving a sentence for stealing a tanker trailer truck and threatening to blow it up. He was evaluated for potential secondary gain or exaggeration of symptoms. He reported living with his wife and working in New Jersey, but he left because he could not tolerate the stress. He reported auditory and visual hallucinations and thoughts of hurting himself or others. He

PAGE 6 - OPINION AND ORDER

presented in a passive, cooperative and fairly pleasant manner.  Upon discharge, he carried

diagnoses of depressive disorder, PTSD, alcohol abuse in partial remission, and cluster B

personality disorder.

Boudreau obtained medical and psychiatric treatment for a little over a year–between

January 2008 to late-February 2009–from the New Jersey Department of Corrections.  While

incarcerated, Boudreau was prescribed Risperdal and Prozac.  He stopped taking the Risperdal in

February 2008, began feeling angry and hostile, with migraine headache, ongoing auditory

hallucinations telling him to harm others, and visual hallucinations of dragons telling him to

harm others.  He denied any connection between missing the Risperdal and his auditory and

visual hallucinations.  He was placed on watch for psychiatric decompensation for a day and was

released when he had taken his medications and reported feeling better.

Throughout February and March, Boudreau periodically declined medications.  He was

diagnosed with PTSD, psychotic disorder NOS, malingering, antisocial personality disorder, and

a history of major depressive disorder (recurrent, severe, psychotic).  Tr. 398.  In March 2008,

Boudreau was charged with stealing from the kitchen and lost his job; he said he was responding

to a command hallucination.  When asked about it, his psychologist opined that Boudreau

"complains of chronic auditory hallucinations since childhood.  However, he has been stabilized

on medication and there is no compelling evidence that the inmate's mental condition

contributed to the behavior associated with the alleged infraction."  Tr. 394.  Boudreau admitted

he had been able to ignore the voices in similar circumstances.

On March 11, 2008, Boudreau reported the medication had not stopped the voices

directing him to steal and, as a result, he refused medications.  His doctor replaced the Risperdal

with Depakote, and the Prozac with Remeron. She noted he appeared stable. Two weeks later, Boudreau appeared improved and noted his job had presented too many triggers and he was glad to lose it. He continued to improve in April and his doctor assessed his PTSD as improved. The Depakote was discontinued in May as it caused Boudreau to have tremors. The Remeron helped him sleep and the dosage was increased, then decreased a few days later for making him overly sleepy. Otherwise, he was stable in May and June. He asked to stop taking any medication in July. He felt more focused and began planning for his release.

During a July 29, 2008 psychiatric evaluation, Boudreau reported that his main problems were voices, visual hallucinations, and sleep problems. He reported trying to control his murderous thoughts by engaging in martial arts and art work. Referring to "old records," his psychologist noted a long history of suicide attempts. Tr. 332. Old records also indicated six years of college in business management and science, and different jobs as a truck-trailer driver, nurse, architect, and construction worker. The plan was for Boudreau to continue without medication and explore history and diagnosis of manipulative behavior.

Boudreau remained off psych medications through August. In September, he showed improvement in his impulsiveness, anger, and manipulating others. His psychologist concluded Boudreau did not need a referral for psychiatric medication due to his overall stable mood and affect. Boudreau reported the ability to manage his thoughts, behavior, and emotions, although he continued to have images and visions of past trauma. He continued to appear stable in October.

In November, Boudreau reported increasing frustration with his cell mate, having visions of murdering older men, and disclosed memories of shooting (but not killing his father) and of

PAGE 8 - OPINION AND ORDER

killing animals and drinking their blood.  The psychologist noted, "It is unclear at this point to what extent [inmate] was attempting to get a reaction from this therapist."  Tr. 303.

Boudreau told a therapist he faced a detainer in Virginia once he was released from New Jersey; the detainer arose from a parole violation following 18 months in county jail for "attempted bombing."  Tr. 301.  Apparently, Boudreau had stolen a tractor trailer full of gasoline and planned to blow up the local police station because he was angry with them.  The psychologist recorded Boudreau's claim to be designing inventions, and to have financial backers for his designs, and described Boudreau as displaying a bright affect and being grandiose.

In December, at his request, Boudreau was placed on suicide watch because he expressed homicidal thoughts toward his cell-mate.  He was released the next day after underscoring he had no plan or intention to act on his thoughts.  A few days later, he reported doing much better and appeared euthymic, calm and lucid.  He was psychiatrically stable at the end of December, looking forward to his release.  He thought he could return to his work as an architect and engineer after release.  Tr. 281.  He was fine in January 2009, learned that his Virginia detainer for a parole violation would be dismissed, and was looking forward to his release at the end of February.

He was back in the emergency room in May 2009 complaining of hearing voices telling him to jump in front of a car or push someone in front of a car.  Tr. 490.  He reported suicidal ideation and cocaine use in July 2009.

Boudreau met with Tom M. Dooley, Psy.D. in April 2012.  Dr. Dooley described Boudreau as a poor historian, with below average intelligence inconsistent with his report of earning an engineering degree.  Boudreau reported a history of sexual abuse at the hands of his

father, as well as a head injury from his father hitting him with a baseball bat. Boudreau rated his

depression at 3 out of 10 (10 being the worst) and his anxiety at 6 out of 10. He reported

delusional thoughts telling him to hurt himself and others. Dr. Dooley thought Boudreau would

need a payee if he received benefits. Boudreau lived with his partner of 15 months, he did not

socialize with anyone else, and he spent his days working on models, drawing, and watching

television in the evening. Dr. Dooley diagnosed bipolar disorder, schizophrenia, rule out PTSD,

and antisocial personality disorder. He assigned a Global Assessment of Functioning score of

50.[1]

## DISCUSSION

Boudreau points to medical record evidence, medical opinion evidence, and the lay

witness statement to support his argument that the ALJ failed to fairly assess the evidence

supporting the existence of his audio and visual hallucinations. The ALJ found not credible

Boudreau's testimony that he could not work because of his hallucinations and anger and that he

had a history of killing and mutilating animals, that he beat his ex-wife and her boyfriend with a

bat, and set the house on fire, that he attended Boston University and Massachusetts institute of

Technology, and that he worked for Chrysler designing cars. At the same time, the ALJ accepted

Boudreau's criminal history for assault, arson, grand theft, animal cruelty, and attempted

manslaughter.

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 means "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) ("DSM-IV"). The most recent edition of the DSM eliminated the GAF scale. *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2012).

The ALJ concluded from Dr. Dooley's report that Boudreau had good concentration without significant distractibility, there was no sign of delusions or hallucinations, and Boudreau could cooperate and function, even though Boudreau said he was too angry to look for a job.

I.    Boudreau's Credibility

The ALJ found Boudreau not credible because of his daily activities, inconsistent statements about his work history, his convictions (namely for theft), inconsistent statements about his drug and alcohol use, and minimal treatment for his impairments.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Boudreau does not challenge the ALJ's findings with regard to his daily activities, his convictions, or his inconsistent statements.  I note that it is not clear to me–and should be the subject of further exploration–whether Boudreau's statements about his engineering degree and work at Chrysler (and similar statements) are symptoms of his impairment or appropriate credibility considerations.

With regard to the ALJ's interpretation of the medical record, and lack of treatment, the ALJ's interpretation of the record is not supported by substantial evidence.  As Boudreau points out, the ALJ did not mention the hallucinations Boudreau described in 2005 at Catawba Hospital, did not report the hallucinations in prison (other than the theft incident), and ascribed an opinion to Dr. Dooley about the lack of delusional signs when he did not make that observation.  In addition, the ALJ did not discuss the May 2009 report to the emergency room for hallucinations. While she viewed Boudreau's mental health record in jail as demonstrating stability, the record reflects improvement while on medication (mostly the anti-depressant Mirtazapine) and in therapy, Tr. 305-394, but in November and December 2008 Boudreau reported homicidal ideation and appeared grandiose in his plans upon release from prison.  Tr. 303, 301.  He was released in February 2009, but was back in the emergency room three months later complaining of hearing voices.  It is "error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment."  *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). Further, any improvement while in jail should also be considered in the context of "being treated and while limiting environmental stressors" which "does not always mean that a claimant can function effectively in a workplace."  *Id.*

PAGE 12 - OPINION AND ORDER

Additionally, the ALJ referenced Boudreau's lack of treatment in 2006 and 2007, and the records from 2009 consisting only of emergency room reports.  To the extent the ALJ questions the severity of Boudreau's symptoms due to a lack of treatment, she failed to explore the reasons for it.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (some internal citations omitted) ("unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is a valid reason to question testimony); *see Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (failure to obtain medical care due to lack of funds or insurance not a clear and convincing reason).  In addition, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."  *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (internal quotation omitted).

The comments of prison providers about the possibility of Boudreau malingering or exaggerating his symptoms would be a sufficient basis to question his testimony regarding his hallucinations.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (tendency to exaggerate symptoms is valid reason to support a negative credibility finding).  However, although the ALJ mentioned a "pattern of manipulative behavior and malingering" in the context of evaluating Boudreau's severe impairments, contrary to the Commissioner's assertion, she did not expressly rely on such a pattern in assessing Boudreau's credibility.  *Compare* Tr. 21 *with* Tr. 23-25 (mentioned prison doctor's notation of manipulative behavior in prison).  Notably, Dr. Dooley found Boudreau to be "forthright and cooperative[.]"  Tr. 436.

In short, the ALJ did not adequately evaluate the evidence supporting Boudreau's hallucinations or delusions.  The weakness of the other credibility considerations causes me to

reverse and remand for further findings.  Additionally, since I am reversing and remanding, I do

not address the remainder of Boudreau's arguments.

II.     Further Development of the Record

        A Social Security ALJ has an "independent duty to fully and fairly develop the record and

to assure that the claimant's interests are considered."  *Tonapetyan*, 242 F.3d at 1150 (internal

quotation omitted).

        The record here is inadequate to adequately assess Boudreau's mental impairments.

While the ALJ gave "significant weight" to Dr. Dooley's report and found it supported her

finding that Boudreau could perform his past work or other work in the national economy, a

review of Dr. Dooley's conclusion does not appear to support that outcome.  Dr. Dooley

summarized Boudreau's condition as follows:

> Michael Boudreau is a 46-year-old, once divorced male.  He was born in a
> very abusive and chaotic household where he was sexually molested from five to
> seventeen years of age.  He reportedly had a head injury at the hand of his father
> and claims that he has heard voices from that time onward.
>
> He had a significant work history, reportedly working at Chrysler
> designing vehicles for eight years until he quit.  His last job was when he was
> thirty-six years old.  He appears to have a significant criminal history, which is
> listed above, which resulted in fifteen years total in prison.  He appeared to live a
> drug and alcohol centered life up until the age of forty-two, but minimizes his
> issues now.  Even though he states he is an alcoholic, he drinks occasionally once
> a week.  His veracity of some of his historical data was questionable.  He does not
> like being around people and has violent tendencies.
>
> He claims that he has voices in his head telling him to hurt himself and
> other people.  He presented as below average IQ, even of borderline IQ, with poor
> social judgment.  He was psychologically and socially unsophisticated, despite the
> fact that he claims he got a B.A. in Engineering and worked at Chrysler for eight
> years designing vehicles.

> He appears to depend heavily on his partner who is on SSI benefits.  He
> isolates and makes science fiction models for eighteen hours a day.  He does not
> appear to be interested or looking for work at this time.  He is noncompliant with
> any kind of doctor's advice and is not interested in any type of counseling or
> looking for work.  The client appears to have a Personality Disorder and has no
> interest in counseling or following doctor's orders.

Tr. 437-38.  Indeed, the doctor's assessment of Boudreau's functioning at GAF 50, indicating

serious symptoms, does not square with the ALJ's decision to give his opinion "significant

weight" in support of her finding that Boudreau is capable of performing work.  While she gave a

satisfactory reason to give little weight to the score itself, her decision to reject the GAF as

unsupported by the record suggests she misconstrued the doctor's conclusions about Boudreau's

functioning.

III.    Remedy

        The court has the discretion to remand the case for additional evidence and findings or to

award benefits.  *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  The court has

discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally

sufficient reasons for rejecting the evidence, there are no issues to be resolved before a

determination of disability can be made, and it is clear from the record that the ALJ would be

required to find the claimant disabled if the evidence is credited.  *Garrison*, 759 F.3d at 1020.

        Since there are additional issues to be resolved by the ALJ, I remand for further

evaluation of Boudreau's mental impairments, to include objective testing if necessary to fully

assess Boudreau's functioning.

///

///

PAGE 15 - OPINION AND ORDER

**CONCLUSION**

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record as explained above.  Judgment will be entered.


IT IS SO ORDERED.

DATED this 10th day of June, 2016.


 /s/  Garr M. King
Garr M. King
United States District Judge